SIXTH DIVISION

   August 22, 1997

No. 1-96-4186

In Re DANIEL R., a Minor                )  Appeal from the

                              )  Circuit Court of

(The People of the State of Illinois,   )  Cook County. 

                                        )

Petitioner-Appellee,          )

                                        )

v.                            )

                                        )

Martha Elizonda and Daniel R., Sr.., )  

                                        )  

Respondents-Appellees     )

)

(Daniel R., a Minor, )  Honorable

)  Lynne Kawamoto,

Respondent-Appellant)). )  Judge Presiding.  

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

This is the minor-respondent's appeal from an order of the child-protection court (trial court) allowing the public defender's motion on behalf of the parents-respondents for substitution of judge as of right pursuant to section 2-1001(a)(2) of the Code of Civil Procedure (735 ILCS 5/2-1001(a)(2) (West 1994)).

The trial court adjudicated five children of the mother-respondent wards of the court on August 2, 1996. On August 23, 1996, the mother gave birth to a sixth child, Daniel, who has a different father than the other children. The State subsequently filed a neglect petition on behalf of Daniel. On September 26, 1996, the trial court entered an order allowing the public defender's motion on behalf of the parents-respondents for substitution of judge as of right concerning Daniel's petition.

On November 4, 1996, the trial court found that its order allowing a substitution of judge as of right involved an important and currently unresolved question of law. Accordingly, the trial court certified the following question for our review pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308):

"Under the Juvenile Court Act, are abuse and neglect petitions filed on behalf of siblings and/or half siblings of children already under the jurisdiction of the court new actions which would entitle a parent- respondent to substitution of judge as of right under section 2-1001(a)(2) of the Code of Civil Procedure, or are such later-filed petitions merely continuations of or amendments to a single, ongoing family case, which would require a parent-respondent seeking a substitution of judge to demonstrate actual prejudice or other cause under section 2-1001?"

The public guardian argues against allowing substitution as of right under these circumstances for the following reasons: (1) a petition filed on behalf of a minor with siblings already before the trial court constitutes an amendment to a unified "family" case; (2) allowing substitution as of right is contrary to the purpose of the Juvenile Court Act of 1987 (705 ILCS 405 1-1 
et
 
seq
. (West 1994)), established custom and practice and wastes judicial and public resources; (3) allowing substitution as of right will lead to "judge shopping"; (4) as applied, section 2-1001(a)(2) violates the separation of powers clause in the Illinois Constitution; and (5) new sibling petitions are analogous to postdecree petitions under the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 
et
 
seq
 (West 1994)).

 The State's Attorney agrees with the public defender that the correct legal conclusion would allow for substitution as of right under these circumstances, but argues that this court should recognize or create a flexible rule whereby the juvenile court may exercise its discretion in consolidating cases relating to individual children in the same family before a single judge.

For the reasons that follow, we affirm the trial court's order granting substitution of judge as of right.

Lazaro F. (Lazaro) and Martha Elizondo (Martha) are the parents of five daughters. On April 18, 1995, Lazaro took four of the girls to Christopher House Shelter. Lazaro, who did not identify himself as the girls' father, told an employee at the shelter that the children's mother had abandoned them. He left, saying his car was running, and never returned.

The children, Gladiz, Barbara, Teresa and Jessica, ranging in age from seven to two, told the worker the man was their father. The children said they did not know where their mother was and they believed their oldest sister, 11-year-old Cecilia, was still with their father.

On June 3, 1995, Lazaro asked David Gonzalez (Gonzalez), a man who worked at a sporting goods store, to take Cecilia because she needed a place to stay and something to eat. Gonzalez agreed and took Cecilia to the home where his own daughter lived with his girlfriend and the girlfriend's mother. Lazaro never returned for Cecilia.

On April 20, 1995, the State's Attorney filed petitions for adjudication of wardship on behalf of Gladiz, Barbara, Teresa and Jessica. A few weeks later, the State filed a petition on behalf of Cecilia. The trial court awarded temporary custody of the children to the Illinois Department of Children and Family Services (DCFS) and continued the matter for hearing on the State's petitions. 

On June 4, 1996, the court held an adjudicatory hearing regarding all of the children but Cecilia, whose case was continued to afford the State time to subpoena an additional witness. Two witnesses testified at the June 4, 1996, hearing, Phoebe Leopoldo (Leopoldo), a worker from Christopher House, and Martha. 

Leopoldo testified to the deposit of the four younger girls with Christopher House and the father's failure to return for them. Leopoldo notified the police, who came and took the children from the shelter.

Martha testified that she was in jail in Milwaukee, Wisconsin, during March and April of 1995. Upon her release, she returned to the family apartment in Milwaukee and found it empty. She did not know where Lazaro and her five children were.

Martha further testified that she was homeless until Lazaro found her on the streets. He told her that the children were staying with a friend and that he had rented an apartment for the family in Chicago. When she and Lazaro arrived in Chicago, they picked up the girls and took them to the "apartment," which turned out to be a shelter.

Martha said that one of Lazaro's friends gave him some drugs and "from then on he was on it, he's always been on it." She testified that, one day in April, she left the shelter to get food, and upon her return four hours later, Lazaro and the children were gone. Martha remained at the shelter for about a month but did not contact authorities with respect to the children.

The trial court found the four girls neglected because both parents failed to provide them with the care necessary for their well-being. The court noted specifically Martha's failure to make any efforts to locate her children. The court then continued the case to August 2, 1996, for an adjudicatory hearing regarding Cecilia and a dispositional hearing regarding all the girls.

Four witnesses testified at the August 2, 1996, hearing, including the people to whom Cecilia had been entrusted.

The testimony indicated that Cecilia had been exposed to her parents' drug use and lived in an injurious environment lacking stability and support. 

Martha testified that Lazaro physically abused her and kept the whereabouts of the children from her, that she was homeless in Milwaukee, and that she had no way of inquiring as to the welfare of her children. Martha eventually "ran into" Lazaro, and he asked her to accompany him to Chicago, where he had rented an apartment from which he later removed the children without advising Martha or relaying their whereabouts.

Based upon the above testimony, the trial court found that Cecilia was neglected because her parents failed to provide her with the necessary care and because they failed to ensure that Cecilia was in a safe environment. The court proceeded to hold a dispositional hearing for all five girls.

Two Catholic Charities case workers testified at the dispositional hearing. Kathleen Walsh (Walsh) testified that she was assigned to work with Barbara, Teresa, Gladiz and Jessica in July 1995 and that the girls were placed together in a nonrelative foster home.

Martha visited the girls monthly. She had cooperated with some of the services offered through the agency. She had completed a psychological evaluation and a drug assessment, but she had not completed parenting classes or initiated counseling.

Walsh reported that Martha had two or three negative urine drops in June 1996, so that her drug assessment indicated that she did not need drug treatment services at that time.

Lazaro could not be located, had not visited his children and was uninvolved with any services provided by Catholic Charities. In Walsh's opinion, it was in the best interests of Barbara, Teresa, Gladiz and Jessica to be placed under the guardianship of DCFS.

The trial court found that it was in the best interests of all the girls to be adjudicated wards of the court. The court determined that Martha was unable to provide protection and care for them and their father was both unable and unwilling to do so. Noting that a permanency goal of long-term foster care had been established for all of the sisters in September 1995, the trial court scheduled a court review of that goal for November 1, 1996.

On August 23, 1996, Martha gave birth to a sixth child, Daniel R. When Daniel was about three weeks old, Martha tested positive for illegal drugs. A Catholic Charities case worker submitted to the State's Attorney a request for filing abuse/neglect petition (petition request) regarding Daniel because of Martha's unabated drug use.

The petition request included a child-endangerment risk-assessment protocol that detailed Martha's history of neglect of her other five children, including her admission that she had been responsible for the loss of their custody. The petition request also included various documents previously submitted to the trial court concerning Daniel's half-sisters. A January 1996 status report indicated that Martha left a voice-mail message for her case worker in October 1995, admitting that she was addicted to crack cocaine.

A July 12, 1996, case transfer summary included with the petition request summarized the history of Martha's loss of custody over her daughters. The summary reported that Martha would like to regain custody of her children but "has not taken steps to do so."

An August 7, 1995, report prepared by Catholic Charities was also included with the petition request and detailed Martha's family history and the recent events that resulted in the trial court granting DCFS guardianship of Martha's daughters. The petition request further included Martha's September 27, 1995, psychological evaluation that observed that "it is [presently] unlikely that she will be a reliable caretaker for [her children]."

Based on the petition request and accompanying documents, the State filed a wardship petition regarding Daniel. The petition alleged that Daniel was neglected because Martha:

"tested positive for controlled substance on September 13, 1996; has not complied fully with services including individual counseling and parenting classes; [and] minor's siblings were left with inadequate supervision."

The trial court held the initial hearing on Daniel's petition on September 23, 1996. The public defender appointed to represent both Martha and Daniel's father, Daniel R., Sr., moved pursuant to section 2-1001(a)(2) for a substitution of judge as a matter of right. The public defender argued that his clients would not receive an impartial hearing because Martha's other children were already before the court.

On September 26, 1996, the trial court granted the motion to substitute over the objection of the public guardian. The trial court found that, 
although substitution of judge was contrary to the best interests of the children, it had to grant the public defender's motion as the court was constrained by its reading of two cases and the applicable statutory provisions. The trial court then transferred Daniel's petition to another judge but retained jurisdiction of the petitions regarding Martha's other children. On November 25, pursuant to the public guardian's petition pursuant to Rule 308, the trial court certified this question of law for immediate appeal. This court accepted the appeal on January 24, 1997.

Section 2-1001(a)(2) provides:

"Substitution as of right. When a party timely exercises his or her right to a substitution without cause as provided in this paragraph (2).

(i) Each party shall be entitled to one substitution of judge without cause as a matter of right.

(ii) An application for substitution of judge as of right shall be made by motion and shall be granted if it is presented before trial or hearing begins and before the judge to whom it is presented has ruled on any substantial issue in the case, or if it is presented by consent of the parties.

(iii) If any party has not entered an appearance in the case and has not been found in default, rulings in the case by the judge on any substantial issue before the party's appearance shall not be grounds for denying an otherwise timely application for substitution of judge as of right by the party." 735 ILCS 5/2-1001(a)(2) (West 1994). 

It is well settled that the Illinois Code of Civil Procedure applies to juvenile proceedings when the child's liberty is not at issue and when no other section specifically regulates the procedure at issue. 
In re Darnell J.
, 196 Ill. App. 3d 510 (1990). In 
Darnell
, the reviewing court found that section 2-1001 was applicable in an abuse and neglect proceeding and the trial judge before whom the motion for substitution was made had "no discretion" to deny the motion. 
Darnell
, 196 Ill. App. 3d at 513. This holding was reaffirmed by our supreme court in 
In re Dominique F
.
, 145 Ill. 2d 311 (1991). This is controlling precedent that the public guardian seeks to overcome with a series of arguments relating to the issues that follow.

1. Whether a Petition Filed on Behalf of a 

Minor With Siblings Already Before the Trial 

Court Constitutes an Amendment or Addition to 

a Unified "Family" Case or a New or "Individual" 

Case Under the Juvenile Court Act.

Under the "family" case construct, the trial court would invariably have ruled on a "substantial issue" in the "case" related to the sibling or siblings already before the court. Since a party cannot move for substitution after the judge has ruled on a substantial issue, a party named in a subsequent petition could almost never seek substitution as of right.

While this view might be inviting, under the Juvenile Court Act, a "case" is initiated with the filing of a petition and is entitled "
In re the interest of
 ... a minor," suggesting that each petition relates to the individual minor named in the petition. Petitions are not entitled "
In re the family of
 ... Smith." Moreover, as this court recognized some time ago: "the term 'neglect' does not have a fixed meaning; rather, the term acquires content from the specific circumstances of each individual case. [Citation.] Cases involving an adjudication of neglect and wardship are in effect 
sui generis
, and each case must be decided on its own particular facts. [Citations.]" 
In re Brooks
, 63 Ill. App. 3d 328, 337 (1978).

Although 
Brooks
 stands for the proposition that "neglect" is subjective, this also applies within an intrafamily context. That is, to use the public defender's example, while a mother's act of leaving her three-year-old home alone might constitute neglect, the same cannot be said for leaving her teenage child for the same period of time. Thus, even though a family's history is highly relevant, each petition and subject minor should be treated individually. Further, in the present case, there is the additional factor that Daniel has a different father than Martha's other children. Daniel, Sr., certainly has a right, as a newly named respondent in the petition, to seek a substitution of judge. 

Section 2-1001 applies to this proceeding and does not support the public guardian's attempt to extend the definition of "a case" to encompass all "cases" related to the same family. Accordingly, this argument is rejected.

2. Whether Allowing for Substitution as of 

Right in Sibling Cases is Contrary to the 

Purpose of the Juvenile Court Act in That it 

Wastes Judicial and Public Resources.

The public guardian argues that allowing for substitution as of right in this context will result in two or more judges hearing essentially the same evidence and conceivably reaching different conclusions, causing duplicative, confusing and perhaps opposite dispositions. Although this argument has merit, virtually identical arguments have been routinely rejected. 

In both 
Darnell J.
 and 
Dominique F.
, the public guardian moved for substitution as of right from the presiding trial court. The trial court denied the motion after the public guardian observed that he would continue to seek substitution in all 50 cases his office had pending before the trial court. On appeal, the State argued that the denial was proper because the Guardian's practice of routinely filing these petitions in every case before the particular trial court "disrupts the smooth functioning of the courts." 
Darnell J.
, 196 Ill. App. 3d at 513; 
Dominique F.
, 145 Ill. 2d at 320.
 Justice Bilandic, writing for the court in both cases, held that "[t]he purported disruption of the trial court's functioning asserted by the State in the case at bar does not provide a rationale for departing from these principles [that a trial court has no discretion to deny a properly filed petition for substitution of judge]. Such a disruption, should it be found to exist, can be dealt with swiftly and effectively by other means." 
Dominique F.
, 145 Ill. 2d at 321; see also 
Darnell J.
, 196 Ill. App. 3d at 514.

The State raised a similar "judicial economy" argument in 
In re R.L.
, 282 Ill. App. 3d 839 (1996). 
R.L.
 asked this court to resolve the question of whether the finding of probable cause at a minor's detention hearing, required to be held within 36 hours of "arrest," should be deemed a finding of probable cause at a subsequent hearing to determine whether the minor ought to be transferred to the adult criminal justice system. 
R.L.
, 282 Ill. App. 3d
 at 842.

In rejecting the State's argument that the earlier finding of probable cause should be binding in the subsequent proceeding, t
his court observed: "The State raises concerns about judicial economy. If economies are to be achieved in the criminal justice system, they should be elsewhere than in the disposition of matters affecting our children." 
R.L.
, 282 Ill. App. 3d at 848. See also
 
Boatmen v. A.P. Green Refractory Co.
, 223 Ill. App. 3d 121 (1991) (rejecting judicial economy argument with respect to substitution of judges).

Although undoubtedly true, the public guardian's invocation of "judicial economy" and "waste of resources" has been rejected in the past, particularly where the rights of minors are at issue. This court sees no compelling reason to depart from established precedent.

3. Whether the "Core Principle" of the Juvenile 

Court Act, the "Best Interests of the Minor," 

Should Somehow be Used to Override Case Law in 

Favor of Judicial Substitution as a Matter of Right.

Initially, the public guardian points to three sections of the Juvenile Court Act that "embody" the best interests of the minor mandate and lead to the conclusion that allowing substitution as of right would frustrate the ability to effectuate this mandate.

The policy and purpose of the Act is:

"to secure for each minor subject hereto such care and guidance, preferably in his or her own home, as will serve the moral, emotional, mental, and physical welfare of the minor and the best interests of the community; to preserve and strengthen the minor's family ties whenever possible ***.

*** In all proceedings under this Act the court may direct the course thereof so as *** fully to gather information bearing upon the current condition and future welfare of persons subject to this Act." 705 

ILCS 405/1-2(1) and (2) (West 1994).

The public guardian argues that "[i]f, as a result of substitution as of right, the cases of individual siblings are distributed among two or more judges, the difficulty of complying with this mandate is needlessly multiplied for the child protection court."

While this argument also has logical appeal -- consolidating a minor's case before the judge already familiar with the family's history is intuitive -- it basically repeats the public guardian's "judicial economy" argument. We initially observe that the Guardian's argument overestimates the burden caused by substitution to a different trial court. We are well aware of the demands inherent in reviewing a case from a "cold" record and believe our trial courts capable of meeting those demands without compromising the minor's interests. Moreover, as noted above, section 2-1001 applies to these proceedings and has been consistently recognized as creating an almost absolute right to substitution. Additionally, the public guardian ignores other language of the Act's purpose that emphasizes "the best interests 
of the community
" and "future welfare 
of persons subject to this Act
." (Emphasis added.) 705 ILCS 405/1-2(1)(2) (West 1994). Certainly, the Act's remedial purpose is not exclusive to the minor, but also recognizes a parent's right to an impartial judge. This is served by allowing substitution as of right.

Section 2-10-(10), relating to temporary custody hearings, provides that where there is an immediate and urgent necessity for the abused minor to be placed in shelter care, such immediate and urgent necessity shall be presumed for any other minor residing in the same household as the abused minor. 705 ILCS 405/2-10-(10) (West 1994).

Additionally, in any hearing under the Act, proof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible. 705 ILCS 405/2-18(3) (West 1994).

The public guardian contends that these sections "manifest a legislative intent that the child protection court consider the circumstances of a child's siblings when making determinations about ordering shelter care for that child." All agree that these sections establish a presumption of an abusive environment. The disagreement lies, however, in the public guardian's contention that the only way to apply the presumption is through the same individual judge. A second judge, if substitution is granted, can apply the presumption, and, in fact, the sections may have been written with this in mind. That is, a second judge less familiar with a family's history is given the power to 
presume
 abuse exists in a temporary custody setting and use as "admissible evidence" a prior finding of abuse, neglect or dependency. Thus, these sections actually serve to alleviate the public guardian's concerns with the second judge's difficulties assessing a minor's environment, as they supply procedures whereby that second judge can use presumptions and admissible evidence arising from an earlier proceeding in a present proceeding concerning a sibling. 

Finally, this court would be breaking new ground in recognizing the supremacy of the "best interests" mandate over the plain and unambiguous statutory right to substitution of judge. We decline this invitation, finding nothing in the Juvenile Court Act, the Civil Practice Act or case law that authorizes "joinder" of petitions to form a unified "family" case. 

4. Whether Allowing Substitution as of Right 

Will Lead to "Judge Shopping."

It is well established in Illinois that a petition for substitution of judge as of right comes too late when it is presented after the judge has ruled on a substantive issue on the case. 
Marshall Savings & Loan Ass'n v. Henson
, 78 Ill. App. 2d 14 (1966). The policy behind this rule is to preclude a litigant's attempt to "judge shop" after forming an opinion that the judge may be unfavorably disposed toward that litigant's cause. 
In re Marriage of Talty
, 252 Ill. App. 3d 80 (1993), 
rev'd on other grounds
, 166 Ill. 2d 232 (1995).

Again, no one disputes that a party cannot seek substitution after the judge has issued a ruling on a substantial issue. The public guardian is simply returning to its earlier argument that a subsequent petition filed on behalf of a sibling is an amendment or continuation of an existing "family" case. We have determined that this view is unsupported. Instead, the second petition is a separate, "individual" case. 

5. Whether, as Applied in Proceedings Under 

the Juvenile Court Act Regarding Sibling Groups, Section 2-1001(a)(2) Violates the Separation of 

Powers Clause in the Illinois Constitution.

The public guardian contends: 

"On the basis of unsubstantiated allegations of prejudice, an Assistant Public Defender can sever the cases of family members and require two judges to review the same evidence regarding a single family. Under these circumstances, the utilization of 2- 1001(a)(2) motions constitutes an unconstitutional interference with the administration of the judicial branch, and forces the child protection courts to engage in piecemeal adjudication of issues vital to the children and to the potential reunification of their families."

Put simply, the public guardian argues that the public defender, a component of the executive branch, uses legislation -- section 2-1001 -- that impermissibly interferes with the judiciary's inherent power to administer and supervise the court system, thereby creating a separation of powers conflict between the executive branch and the judiciary. This argument is misplaced.

In 
People ex rel. Baricevic v. Wharton
, 136 Ill. 2d 423 (1990), the State's Attorney filed six timely motions for substitution of judge as of right (pursuant to section 114-5(c) of the Code of Criminal Procedure) before a certain judge. The judge denied those motions, finding that the State was using the motions to encourage the chief judge to remove him from the felony docket and that such interference with the chief judge's assignment power violated the separation of powers clause of the Illinois Constitution. 
Wharton
, 136 Ill. 2d at 428-29. 

Reversing, the supreme court reaffirmed its holding in 
People v. Williams
, 124 Ill. 2d 300 (1988), that "section 114-5(c) does not constitute an impermissible legislative infringement on the judiciary in violation of the separation of powers doctrine." 
Wharton
, 136 Ill. 2d at 434. However, the court recognized that, unlike 
Williams
, where the State's Attorney's use of a section 114-5(c) motion in a single case could not be said to have anything more than a "peripheral effect on judicial administration," the State's Attorney's "blanket use" of substitution motions in all felony proceedings before a particular judge, when viewed in conjunction with the State's Attorney's earlier attempts at having that judge reassigned, "poses a substantial threat to the dignity and independence of the judiciary." 
Wharton
, 136 Ill. 2d at 435.

In response, the supreme court established a 
Batson
-like procedure to review, in rare instances, a party's use of substitution-of-judge motions: 

"[w]e find that the following procedure is appropriate for reviewing whether a prosecutor's use of section 114-5(c) violates the separation of powers doctrine. First, the trial judge must determine whether there is 
prima facie
 evidence that the motions are being used in an effort to thwart the chief judge of the circuit court's independence in assigning cases to the judges in his circuit. Among the factors that may be considered *** are whether the State's Attorney's office has used, and indicates that it plans to 

continue using, section 114-5(c) motions on a blanket 

basis in almost every case assigned to the judge; 

whether the State's Attorney's office has made other 

attempts besides use of section 114-5(c) motions to 

have the judge reassigned *** and any other evidence 

that indicates that the section 114-5(c) motions are being used for the purpose of influencing the chief judge in his assignment decisions. 

If the trial judge determines that a 
prima facie
 case does not exist, the section 114-5(c) motion must be granted." 
Wharton
, 136 Ill. 2d at 438-39.

The evil guarded against in 
Wharton
 is the State's abusing substitution motions to target an individual judge. This "evil" is not present in the instant case, where substitution would be case specific
.

Thus, although no "
Wharton
" hearing was held in this case, and in fact this issue was not raised below, the present case is distinguishable from 
Wharton
 and 
Williams
 since no individual juvenile court judge is targeted.

6. Whether, Since the Supreme Court has Determined 

that Postdecree Petitions Under the Illinois 

Marriage and Dissolution of Marriage Act do not Constitute New Actions, the Same Should Hold True 

for Subsequent Petitions Under the Juvenile Court Act?

In 
In re Marriage of Kozloff
, 101 Ill. 2d 526 (1984), the supreme court rejected the rule that postdecree petitions are new cases, observing a potential for "serious abuse of the venue act." 
Kozloff
, 101 Ill. 2d at 530. The court found that post-decree petitions are merely continuations of the dissolution proceeding; therefore, a substantive ruling on one petition would preclude a change of venue as of right on another. 
Kozloff
, 101 Ill. 2d at 531.

The public guardian observes commonality between postdissolution proceedings and proceedings under the Juvenile Court Act, since both types of proceedings may last years, and urges this court to adopt the 
Kozloff
 rule finding sibling petitions to be mere continuations of the original abuse and neglect proceeding.
 

While a novel argument, it fails for two reasons. First, the two types of proceedings are distinguishable. A dissolution proceeding will at its heart always involve the husband and wife, despite remarriage, stepparents, stepsiblings, half-siblings and other changes of circumstance. Postdecree petitions will similarly always relate back to the original divorce judgment or settlement agreement therein incorporated. Conversely, subsequent petitions brought on behalf of siblings may involve new and indispensable parties, 
e.g.
, Daniel R., Sr., as well as issues of "first impression" relating exclusively to the minor subject of the subsequent petition.  

Secondly, 
Kozloff
 cannot be used by this court as authority to alter the status quo of proceedings under the Juvenile Court Act in light of more recent supreme court decisions directly addressing the issue of substitution in abuse and neglect proceedings (
see 
Darnell J.
, 196 Ill. App. 3d 510, and 
Dominique F.
, 145 Ill. 2d 311) and finding the right applicable and absolute.

7. Whether the Custom and Practice in the Cook 

County Child-Protection Division Demonstrates 

that Sibling Groups Under the Jurisdiction of the 

Court are Treated as a Unified Family Case.

This argument once again revisits the public guardian's "judicial economy" argument addressed earlier. As evidence of custom and practice, the public guardian cites the State's Attorney's practice of referring to an earlier proceeding in its petition regarding a "new" sibling petition. No one disputes the efficacy and correctness of such reference, as such is expressly authorized by the Juvenile Court Act. 

The public guardian also observes that "[c]urrently, the Clerk of the Circuit Court for the Child Protection Division assigns a separate number and file jacket for each child for whom an abuse or neglect petition is filed." This is evidence, which the public guardian unpersuasively attempts to dismiss as "administrative nomenclature," that the custom in juvenile court is to treat each new petition as its own case. This is equally, if not more, persuasive evidence of current custom and practice that refutes the public guardian's argument. 

In conclusion, although many of the guardian's arguments make sense and probably would advance the disposition of sibling petitions, neither statute nor case law provides support for these arguments. Moreover, no party to this appeal adequately addresses the rights of Daniel R., Sr., who had nothing to do with Lazaro or Martha's other children and the environment of addiction and neglect in which they were forced to live. Yet the public guardian desires that Daniel R., Sr., and his infant son be viewed as a "continuation" of the past proceedings. 

Because section 2-1001 applies only in the 
absence
 of a specific provision governing substitution of judge as of right in the context of sibling petitions in the Juvenile Court Act (s
ee 
Dominique F.
, 145 Ill. 2d 311), the appropriate solution to this "problem" would be for the legislature to amend the Act to address this issue. It clearly is not the role of this court to carve out an exception to section 2-1001 when the supreme court has held that it applies and is absolute in neglect proceedings. Accordingly, we recognize the right to substitution and affirm the trial court's order granting Martha and Daniel R., Sr., substitution of judge in the instant case.

Affirmed.

THEIS, J., and ZWICK, J., concur.